COMMONWEALTH *vs.* JERRY FUNDERBERG
(and four companion cases [1]).

Suffolk. January 4, 1978. — March 6, 1978.

Present: HENNESSEY, C.J., QUIRICO, BRAUCHER, KAPLAN, & ABRAMS, JJ.

*Practice, Criminal,* Continuance. *Identification.*

A judge at a murder trial did not abuse his discretion in denying motions for continuances by defense counsel who had been appointed twenty-four days prior to trial after previous counsel, who had represented the defendant for nearly eleven months, withdrew. [579-581]

--------

[1] Two companion cases are against Jerry Funderberg and two are against Raymond Gaines.

Evidence at a pre-trial hearing on a motion to suppress photographic
identifications of two defendants and further evidence developed at
trial supported the judge's finding that the pre-trial identification pro-
cedures were not impermissibly suggestive. [581-582]

INDICTMENTS found and returned in the Superior Court
on May 16, 1975.

The cases were tried before *Roy*, J.

*Martin K. Leppo* for Raymond Gaines.

*Michael R. Pizziferri (Joseph A. Todisco* with him) for
Jerry Funderberg.

*Robert J. McKenna, Jr.,* Assistant District Attorney *(Mi-
chael J. Traft,* Special Assistant District Attorney, with
him) for the Commonwealth.

BRAUCHER, J.  The two defendants were convicted of
murder in the first degree and armed robbery, and the de-
fendant Funderberg was convicted of unlawful possession of
a handgun. They appeal. The defendant Gaines assigns er-
ror in the denial of his repeated requests for a continuance,
both defendants assign error with respect to photographic
identifications, and the defendant Funderberg assigns addi-
tional errors with respect to the exclusion of evidence and
instructions to the jury. We affirm the convictions.

The Commonwealth introduced evidence tending to
prove the following facts. About 4 P.M. on Tuesday, De-
cember 10, 1974, the victim's fifteen-year old son was tend-
ing the cash register in his father's shoe repair shop in Rox-
bury. Three men entered the shop, Gaines, Funderberg,
and a third man, Anderson. Gaines took money from the
cash register; Funderberg and Anderson had guns, and one
of them shot and fatally wounded the victim. The three
men then backed out of the store and ran toward a nearby
housing project.

An apartment in the housing project was used as a "shoot-
ing gallery," where customers could use heroin. The three
men arrived there, out of breath, some time after 4 P.M.
that day. Funderberg had a gun in his belt. He said, "When
we get ready to do something and you get in the line of fire,
you get hurt, too." One of them said, *"How much money*

did we get?" The answer was $120. One said, "Oh, let's go back in the back room to do what we intended to do." The three were in the back room when the police knocked on the door of the apartment and were admitted, but the police left when the proprietor of the "shooting gallery" asked them for a search warrant. Two or three days later, according to the proprietor's testimony, "Funderberg was telling Anderson that he thought he'd hit him [the victim], you know, and Anderson said he don't think his shot hit him."

In May, 1975, Gaines was in jail in Des Moines, Iowa, and three police officers obtained arrest warrants and went to Iowa to bring him back to Boston. Miranda warnings were given to Gaines. The next day, on the return flight, Gaines told an officer-witness "that I didn't warn him of his rights so he could tell me the story. . . . He told me he was there when it happened, when it went down. He told me that the boy would never be able to recognize him because he pulled his hat down on his forehead and he took out his teeth."

The defendants attacked the identifications made by the victim's son, and sought to show bias in the testimony placing them in the "shooting gallery." Each of them also presented alibi testimony. Gaines and his aunt testified that he left Boston on a bus for Iowa on December 8, 1974, and that he telephoned her on his arrival on December 10. Five witnesses testified that Funderberg was babysitting in his sister's apartment from about 3:30 to 5 P.M. on December 10.

1. *Gaines's requests for continuance.* Gaines was indicted in May, 1975; on July 1, 1975, a Superior Court judge appointed counsel requested by Gaines by name. After filing a number of pre-trial motions, counsel withdrew on May 21, 1976. New counsel was appointed the same day, and trial was scheduled for June 9, 1976. Some time before then a written motion for continuance was filed by the new counsel and denied. At a pre-trial hearing on June 9, he complained that he was not entirely ready for trial. During a voir dire hearing on June 10 on photographic identifications

he orally renewed his motion for a continuance, stating that he was not prepared and that he wanted to "check out the truth and veracity" of the testimony of the officer who assembled the photographs; the motion was denied. On Monday, June 14, counsel stated that he had not had time to obtain certified copies of the criminal records of Alfred Hamilton, a prosecution witness; he was given the opportunity to use the lunch break to obtain the records, but he did not produce them. On June 15, after the Commonwealth had completed its case in chief, he requested a mistrial or a continuance to obtain process to compel the attendance of Gaines's mother, an alibi witness in Iowa; the motion was denied.

Whether a motion for continuance should be granted lies within the sound discretion of the judge, whose action will not be disturbed unless there is a patent abuse of discretion. *Commonwealth* v. *Cavanaugh,* 371 Mass. 46, 50-51 (1976). *Commonwealth* v. *Gilchrest,* 364 Mass. 272, 276 (1973). *Commonwealth* v. *Bettencourt,* 361 Mass. 515, 517-518 (1972). The reasons presented to the judge when the requests were denied were not such as to demonstrate that denial was an abuse of discretion, and a reading of the transcript fails to indicate that the quality of the defense was perceptibly impaired by the denials.

The written pre-trial motion stated only that time was needed "to investigate the alibi defense, interview witnesses, obtain and review hospital and other records." The defendant had known of his coming trial for more than a year, during most of which he was represented by counsel of his choice. Twenty-four days elapsed from the time new counsel was appointed until he began to present the defense, and counsel obviously had time to interview witnesses and obtain records locally. The need to compel the attendance of an Iowa witness apparently arose on the fifth day of trial, when the witness refused to come. It appeared to the judge that her testimony "would just corroborate" other testimony; there was no showing that she could have presented convincing corroboration on the critical matter of the date the

defendant went to Iowa. See *Commonwealth* v. *Dirring,* 354 Mass. 523, 529-530 (1968).

2. *Photographic identifications.* Before trial Gaines moved to suppress photographic identifications and resulting in-court identifications. After hearing, the judge found that a fair mixture of photographs was presented to the victim's son, that there was no suggestiveness in the manner of presentation, and that his identifications of the defendants were untainted. The judge said that the reliability and weight of any identification were for the jury, and denied the motion. He directed that the witness not be shown the photographs until he testified again, and arrangements were made for sanitized reproductions, eliminating police notations.

The victim's son was the first witness at trial; on direct examination he identified the defendants as two of the three robbers, but did not testify to prior photographic identifications. Cross-examination on behalf of Gaines revealed prior viewing of photographs, and, after a second voir dire hearing, evidence tending to show the following facts was produced before the jury by the victim's son and the police officers who had taken part.

The victim's son was shown sixty-one photographs of black males on December 11, 1974. Photographs of the defendants were not included, and he identified two other individuals. One was the stepson of the proprietor of the "shooting gallery" apartment; the other, Hamilton, was married before the trial to the proprietor's sister. Both were present in that apartment at some time during the afternoon of the crime; both were arrested for the crime and later released.

The victim's son next spoke to the police on February 17, 1975, when he was shown an array of sixty-five photographs. These consisted of the same sixty-one plus one of each of the defendants and two of Anderson. This time he picked out the two defendants. He testified that the police told him that he had identified the wrong persons the first time, but the police officers testified to the contrary, and

before trial the judge had accepted their version of their procedure in preference to his version. The son did not know that identical photographs were shown both times.

Contrary to the defendants' arguments, we conclude that the evidence developed at trial confirmed the judge's pre-trial finding that the second showing was not impermissibly suggestive. After a lapse of two months, with no intervening communication between the identifying witness and the police, there was no dramatic focus on the four added photographs. Contrast *Commonwealth* v. *Pettijohn*, 373 Mass. 26, 28-29 (1977). The weaknesses in the identifications were fully aired before the jury. Since the pre-trial identification procedures were not constitutionally defective, we need not consider whether the in-court identifications had an independent basis. *Commonwealth* v. *Chase*, 372 Mass. 736, 745 (1977), and cases cited.

3. *Funderberg's other contentions.* We refer briefly to Funderberg's other contentions, none of which has merit.

a. As to restriction of the recross-examination, see *Commonwealth* v. *Hall*, 369 Mass. 715, 731 (1976).

b. Funderberg's argument that a photograph was used improperly in cross-examination of a defense witness depends on facts not established in the record before us.

c. As to the sufficiency of cautionary instructions when a witness made an unresponsive answer, see *Commonwealth* v. *Ferro*, 372 Mass. 379, 384 (1977).

d. As to evidence offered after closing arguments, see *Duchesneau* v. *Jaskoviak*, 360 Mass. 730, 734 (1972); *Commonwealth* v. *Williams*, 5 Mass. App. Ct. 809 (1977).

e. As to the judge's instruction with respect to the right to search a dwelling, see *Selectmen of Framingham* v. *Municipal Court of the City of Boston*, 373 Mass. 783, 785-786 (1977).

4. *Section 33E.* After reviewing the law and the evidence, we have concluded that neither defendant is entitled to relief under G. L. c. 278, § 33E.

*Judgments affirmed.*