SUPREME JUDICIAL COURT 
 
 COMMONWEALTH vs. RAYMOND GAINES

 
 Docket:
 SJC-13446
 
 
 Dates:
 March 4, 2024 - August 29, 2024
 
 
 Present:
 Budd, C.J., Gaziano, Kafker, Wendlandt, Georges, & Dewar, JJ.
 
 
 County:
 Suffolk
 

 
 Keywords:
 Homicide. Evidence, Identification, Disclosure of evidence, Exculpatory. Identification. Practice, Criminal, Postconviction relief, Disclosure of evidence, Affidavit, New trial, Capital case. Police, Records
 
 

             Indictments found and returned in the Superior Court on May 16, 1975.
            Following review by this court, 374 Mass. 577 (1978), a motion for a new trial, filed on November 30, 2021, was heard by Debra A. Squires-Lee, J.
            A request for leave to appeal was allowed by Wendlandt, J., in the Supreme Judicial Court for the county of Suffolk. 
            David Lewis, Assistant District Attorney, for the Commonwealth.
            Merritt Schnipper for the defendant.
            The following submitted briefs for amici curiae:
            Chauncey B. Wood, Kevin S. Prussia, Madeleine Laupheimer, Asma S. Jaber, & Kaylee Y. Ding for Massachusetts Association of Criminal Defense Lawyers.
            Isabel Burlingame & Jessica J. Lewis for American Civil Liberties Union Foundation of Massachusetts, Inc.
            Matthew A. Wasserman & Lauren J. Gottesman, of New York, William Davison, Yana Grishkan, Elizabeth Foley, Sharon Beckman, & Radha Natarajan for Innocence Project, Inc., & others.
            Katharine Naples-Mitchell for Criminal Justice Institute at Harvard Law School & another.
            GAZIANO, J.  On December 10, 1974, Peter Sulfaro (victim) was shot and killed in his shoe repair shop during the course of an armed robbery.  His fifteen year old son, Paul Sulfaro (Sulfaro or victim's son), was the only witness to his murder.  In the aftermath, three men were convicted of armed robbery and murder in the first degree:  Jerry Funderberg, Robert Anderson, and Raymond Gaines (defendant).  Nearly half a century after the defendant's convictions, which this court affirmed in 1978 on the defendant's direct appeal, and after repeated efforts by the defendant to procure postconviction relief, a judge in the Superior Court (motion judge) granted the defendant's fourth motion for a new trial.  Before us is the Commonwealth's appeal from that decision.
            No physical evidence tied the defendant to the scene.  Instead, the Commonwealth relied on (1) Sulfaro's eyewitness identification of the defendant; (2) testimony from David Bass and other witnesses placing the defendant in Bass's apartment near the scene of the crimes shortly after the robbery; and (3) the defendant's confession to Boston police Detective Peter O'Malley, which was overheard by a Boston police sergeant.
            In granting the defendant's motion for a new trial, the motion judge grounded her analysis on several factors.  First, she found that newly discovered evidence -- in the form of modern eyewitness identification science -- "significantly undercuts all three pieces of evidence" relied on by the prosecution at trial.  Second, she found that the defendant was prejudiced by the nondisclosure of exculpatory evidence that the Commonwealth was required to disclose under Brady v. Maryland, 373 U.S. 83 (1963), including two notes generated by Boston police officers and the pretrial arrest of a key witness against the defendant.  Third, she similarly found that the defendant was prejudiced by the nondisclosure of Bass's posttrial recantation of his testimony against the defendant.  
            The motion judge did not abuse her discretion in granting the defendant's motion for a new trial because two of these factors are sufficient to indicate that justice may not have been done.  First, new eyewitness identification research constitutes newly discovered evidence that would probably have been a real factor in the jury's deliberations.  Second, the defendant was prejudiced by the Commonwealth's failure to disclose both a note relevant to the reliability of Sulfaro's eyewitness identification and the fact that Bass was arrested by O'Malley and faced pending charges during the defendant's trial.  Accordingly, we affirm.  
            Additionally, although we do not agree with the motion judge's assessment of the Bass recantation, we read Mass. R. Prof. C. 3.8, as appearing in 473 Mass. 1301 (2016) (rule 3.8), to require the disclosure of any witness recantation to defendants and, where applicable, their counsel and codefendants.[1] 
            Background.  "We present the relevant factual and procedural background as taken from the record, reserving certain details for the discussion."  Commonwealth v. Tavares, 491 Mass. 362, 363 (2023).    
            1.  Facts.  At about 4 P.M. on December 10, 1974, three men entered the victim's shoe repair store in the Roxbury section of Boston, where the victim's son was minding the register.  Two were armed.  The unarmed man, who Sulfaro later testified was the defendant, requested change for a dollar.  When the victim's son opened the register, the unarmed man reached in to take the cash.  As the victim's son attempted to close the register, the two armed men drew guns.  At this point, the victim came from the back of the store.  The two armed men opened fire, and all three men then fled the scene.  The victim was shot and killed by a gunshot wound to the head.
            Sulfaro provided descriptions of the three men to responding police officers.  He told investigators that one of the armed men, Funderberg, had the following physical characteristics:  "[s]licked back, processed hair, [a] moustache, [B]lack, maybe twenty years of age, [and a] slim build."  The man who grabbed the cash from the register -- the defendant -- was "wearing a hat."  The other armed man, Anderson, had "straight back" hair with "a little reddish tint to it."  Additionally, Sulfaro told the officers that all three men were Black and shared a similar height and build.
            Investigating officers were approached by a woman outside of the shoe repair store, who directed them to go to a second-floor apartment in a nearby housing project, stating, "The ones you're looking for are there."  The apartment in question belonged to David and Lorene Bass,[2] a married couple who ran a "shooting gallery" from the apartment where people could pay David to use his syringes to inject heroin.  Police arrived at the Basses' apartment at around 5:30 P.M.  There, they encountered David and Lorene, as well as Lorene's son Antonio Daniels and family friend Alfred Hamilton.[3]  After speaking with David for about ten minutes, the officers left the apartment.
            Although the officers did not see the defendant in the Basses' apartment, trial testimony from David, Lorene, and Hamilton placed the defendant there at the same time as police on the day of the murder.  Specifically, the defendant, Anderson, and Funderberg allegedly arrived at the apartment at around 4:30 P.M. appearing "out of breath."  As claimed by David and Lorene, Anderson and Funderberg were armed with guns when they arrived, and Anderson said to the other two men that when "you get in the line of fire, you get hurt, too."  The three men "got $120" from the robbery, according to Lorene, and went to the back room of the apartment "to do what [they] intended to do."  After the three men went into the back room to inject heroin, police arrived at the apartment, which prompted the defendant to jump out a window, according to both David and Lorene.
            On December 11, 1974, the day after the murder, Boston police showed Sulfaro sixty-one photographs of Black men living in the local housing project for purposes of identifying the robbers.  None of the photographs depicted the defendant.  From the array, Sulfaro selected two photographs, one depicting Hamilton and the other depicting Daniels.[4]  
            After speaking with David and Lorene, among others, O'Malley and other police officers went to Sulfaro's home sometime between late January and mid-February 1975 to show him a second set of photographs depicting possible suspects.  According to Sulfaro's trial testimony, just before O'Malley arrived to administer the second identification procedure, a Detective "Murphy" called Sulfaro on the telephone, indicating that Sulfaro had "identified the wrong persons" on the first attempt.  The second set of photographs presented to Sulfaro remained the same as the first but included four new photographs:  one of the defendant, one of Funderberg, and two of Anderson.  When officers showed Sulfaro the second set, he picked out Funderberg and the defendant as suspects.  O'Malley made no written record of this selection and obtained arrest warrants for both Funderberg and the defendant the next day.    
            O'Malley later was informed that the defendant had been arrested in Iowa after cleaning staff discovered a knife in his motel room.  In May 1975, O'Malley, along with Boston police Sergeant Stephen Delosh and another officer, travelled to Iowa to take custody of the defendant from an Iowa county jail.  After gaining custody of the defendant, the group embarked on a return flight to Boston.  
            According to O'Malley's trial testimony, during the flight, the defendant admitted that he was at the scene of the crimes.  The defendant said that "the boy [(the victim's son)] would never be able to recognize him because [the defendant had] pulled his hat down on his forehead and [had taken] out his teeth," referring to the defendant's upper dentures.  Although O'Malley did not record this confession or make any written record of its occurrence, he received a look from Delosh signaling that he too had heard the defendant's confession.  At trial, Delosh affirmed that he had overheard the defendant's confession.[5]
            2.  Procedural history.  On May 16, 1975, a grand jury indicted the defendant for armed robbery and murder in the first degree.
            a.  Motion to suppress.  On June 9, 1976, the defendant filed a motion to suppress the second identification procedure,  asserting that it was "unduly suggestive."  At the motion hearing, the defense argued that the use of duplicate photographs in the second identification procedure warranted the suppression of Sulfaro's identification of the defendant.  Later that same day, the motion judge, who was also the trial judge, denied the defendant's motion, finding that "a fair mixture of photographs were presented to [Sulfaro], that there was no suggestiveness in the manner in which they were presented to him," and "that there was no action on the part of the police which tended to focus Sulfaro's attention on the defendant['s] photograph."
            b.  The trial.  The defendant was tried jointly with Funderberg in June 1976.[6]  
            The Commonwealth connected the defendant to the murder primarily through three means:  first, Sulfaro's identification of the defendant as the person who grabbed the cash from the register on the day of the robbery; second, the testimony of David, Lorene, and Hamilton placing the defendant at the Basses' apartment shortly after the armed robbery; and third, the defendant's confession to O'Malley on the plane ride home from Iowa.  
            In response, the defendant asserted a mistaken identity defense.  Defense counsel presented evidence that the defendant had been shot in the leg days before the murder, such that he could not possibly have been one of the assailants, who all ran away from the scene of the shooting.  However, the trial judge precluded testimony about any police investigation into the defendant's physical condition or the alleged shooting of the defendant.  The defendant also presented evidence that he had left Boston to visit his birth mother in Iowa on December 8, 1974, two days before the shooting.  In challenging his alleged confession to O'Malley, the defendant emphasized that O'Malley made no record of the confession and received no contemporaneous confirmation from Delosh that he had overheard it beyond a "high sign."
            The jury found the defendant guilty of murder in the first degree and armed robbery.  He was sentenced to two concurrent terms of life in prison without the possibility of parole, one for the murder charge and one for the armed robbery charge.[7]  
            c.  Postconviction history.  Following his conviction, the defendant filed his first motion for a new trial in July 1976, again arguing that the second photographic identification process was overly suggestive.  The motion was denied in April 1977.  On the defendant's direct appeal, which was consolidated with his appeal from the denial of his first motion for a new trial, this court affirmed both the defendant's convictions and the denial.  See Commonwealth v. Funderberg, 374 Mass. 577, 579-581 (1978).  We reasoned that because there was "no intervening communication between [Sulfaro] and the police" and "no dramatic focus on the four added photographs," the second identification was not unduly suggestive.  Id. at 582.
            Three further efforts to attain postconviction relief met with failure.  The defendant's second motion for a new trial was denied without a hearing in 1995.  His Federal habeas petition was denied in 2003.  His third motion for a new trial was denied in 2014.[8]  In his 2014 motion, which was filed pro se, the defendant inculpated himself by stating that his "agreement with Funderberg and Anderson was for [the defendant] to grab any money when the cash draw[er] was opened and the three would run."  The defendant argued that he "did not have the opportunity to make up his mind [about whether to use guns in the robbery], his mind was totally controlled by Anderson and Funderberg."  However, we note that elsewhere in this 2014 motion, the defendant qualified his comments so as to avoid assuming culpability.  
            New evidence obtained by the defendant in 2018 turned the tide.  Through a public records request, the defendant obtained copies of two affidavits signed by David Bass in 1990 and 1991 in connection with Funderberg's 1992 motion for a new trial.  In the first affidavit (1990 Bass affidavit), Bass averred that his testimony against the defendant was "all lies," that he had made "bogus statements" to the police to "try[] to get [his] [s]on and [f]riend out of jail," and that the defendant had "never been in [his] home."[9]  In the second affidavit, Bass reversed course, again placing the defendant at his apartment with Anderson on the day of the shooting.  Specifically, he averred that while "Funderberg [had] not come in [the Basses'] home," the defendant and Anderson had "taken off" from the shoe repair store and "came to [his] house," where they then proceeded to "use drugs" in the back room.[10]  
            In December 2020, the defendant filed a motion to stay the execution of his sentence, in which he raised arguments similar to those on which his subsequent fourth motion for a new trial would be based.  After a hearing, a Superior Court judge allowed the defendant's motion to stay the execution of his sentence in April 2021.  The defendant was released from custody a few days later.
            In November 2021, the defendant filed his fourth motion for a new trial, in which he maintained that a "confluence of factors" showed that justice may not have been done.  The defendant relied on a variety of evidence in support of his motion, including (1) new scientific developments calling into question Sulfaro's eyewitness identification, (2) the 1990 Bass affidavit, and (3) alleged Brady material that the Commonwealth failed to disclose.  The motion judge, who had previously ruled on the defendant's motion to stay the execution of his sentence, held an evidentiary hearing in July 2022, at which the defendant's trial counsel and an expert on eyewitness identifications both testified on behalf of the defendant.  The motion judge allowed the defendant's fourth motion for a new trial in a written decision dated November 30, 2022.  
            The Commonwealth appealed from the motion judge's order in December 2022 and petitioned a single justice of this court for leave to appeal to the full court pursuant to G. L. c. 278, § 33E's gatekeeper provision.  In June 2023, the single justice allowed the Commonwealth's petition and referred this matter to the full court.  See Commonwealth v. Smith, 460 Mass. 318, 322 (2011), quoting Commonwealth v. Francis, 411 Mass. 579, 583-585 (1992) ("the single's justice's primary focus should be on the meritoriousness or 'substantiality' of the Commonwealth's position on appeal and less on the newness of the underlying issue").
            3.  The motion judge's decision.  "We summarize the judge's findings, . . . supplementing those findings with certain details from the record where they are consistent with the judge's findings and determinations of credibility."  Commonwealth v. DeJesus, 468 Mass. 174, 175 (2014).
            In allowing the defendant's fourth motion for a new trial, the motion judge grounded her decision mainly on two factors:  (1) the existence of new expert evidence related to eyewitness identifications and (2) the Commonwealth's failure to disclose Brady material at the time of trial.  She also considered David Bass's 1990 recantation of his trial testimony.  The motion judge deemed each of these factors independently sufficient to warrant a new trial.  We address each factor in turn.[11]  
            a.  Evolving science of eyewitness identification.  At the evidentiary hearing, the defendant's expert witness described the development of eyewitness identification research since the time of the trial decades earlier.  According to the expert, in "the mid 1970s, when [the defendant] was tried for murder, the field of eyewitness identification science had not developed," such that there was "little to no research" on eyewitness identifications.  The expert testified to new science indicating that four factors can contribute to false memory and erroneous eyewitness identifications:  (1) the conditions during the event (e.g., whether it is light or dark out); (2) the witness's stress level at the time of the event, as the higher the witness's stress at that time, the more difficult it is for the witness to recall accurately; (3) the amount of time that elapsed between the event and the identification, because memory typically starts to fade after one week; and (4) the witness's "receipt of extraneous information" from a third party, such as suggestive statements.  
            Applying these factors to Sulfaro's second identification, the expert opined that Sulfaro was an unreliable eyewitness.  In Sulfaro's first identification, he wrongly identified Hamilton and Daniels.  Then, shortly before his second identification procedure, Sulfaro received a telephone call from an officer named "Murphy" with the Boston police, who informed Sulfaro that he had gotten his first attempted identification wrong.  This second procedure used the same photographs that Sulfaro had seen the first time, with the sole addition of the photographs of Anderson, Funderberg, and the defendant.  It was only then, about two months after the murder, and after both a prior identification and a highly suggestive telephone call, that Sulfaro identified the defendant. 
            In her order, the motion judge concluded that scientific developments in eyewitness identification constitute newly discovered evidence, drawing on our precedents in Commonwealth v. Epps, 474 Mass. 743, 764 (2016); Commonwealth v. Johnson, 473 Mass. 594, 596-597 (2016); and Commonwealth v. Gomes, 470 Mass. 352, 360 (2015), S.C., 478 Mass. 1025 (2018).  As the motion judge explained, the "field of eyewitness identification science did not begin until the late 1970s and early 1980s," years after the defendant's trial.  
            b.  Undisclosed Brady material.  Through postconviction discovery, the defendant obtained documents from the Boston police department that had not been disclosed by the Commonwealth.  These documents include (1) an undated note indicating that the defendant was shot in the leg and was using crutches and a cane "about two months ago" (injury note); (2) an undated note from the Boston police file on the shooting in which an individual named "Frank Murphy" transcribed information concerning the Sulfaro murder investigation (Murphy note),[12] corroborating Sulfaro's statement that he received a telephone call from a "Murphy" who told him that his first identification was incorrect; and (3) records indicating that O'Malley arrested David Bass in April 1976 -- two months before trial -- for possession of hypodermic needles and syringes and, further, that charges against Bass remained pending when Bass testified at trial and were dismissed shortly thereafter.  
            The motion judge found that each of these documents, with the exception of the dismissal of charges against Bass, were within the Commonwealth's possession before or at the time of trial, that they were not disclosed to the defendant, that they constituted exculpatory Brady material, and that their nondisclosure prejudiced the defendant.[13]  
            c.  Bass recantation.  In 1992, as mentioned, Funderberg used the 1990 Bass affidavit as the basis to move for a new trial.  In the 1990 Bass affidavit, Bass claimed that the defendant, Anderson, and Funderberg had never entered his apartment.  Bass reversed course in his 1991 affidavit, claiming that the defendant and Anderson had entered his apartment with "approximately three other men" on the day of the shooting, but that Funderberg was absent.  Then, during the 1992 evidentiary hearing on Funderberg's motion for a new trial, Bass testified that the defendant had entered his apartment while armed on the day of the shooting with Anderson and two other men, but not Funderberg.  This was the first time Bass claimed that the defendant had been armed.  Further, Bass's 1992 testimony again placed Anderson and the defendant at the Basses' apartment on the day of the murder.  Because Bass arrived late and intoxicated to the evidentiary hearing and gave inconsistent testimony on the stand, the judge presiding over Funderberg's motion for a new trial found that "David Bass [was] not a credible witness and [did] not believe his testimony."  The presiding judge then denied Funderberg's motion.  
            In considering the defendant's fourth motion for a new trial, the motion judge found that the defendant first received the 1990 Bass affidavit "in 2018, approximately twenty-six years [after Funderberg moved for a new trial], in response to a public records request for information relating to his case."  Drawing on our case law concerning both pretrial disclosure obligations and a prosecutor's ethical obligations under rule 3.8, the motion judge ultimately found that the Commonwealth had a duty to disclose the 1990 Bass affidavit -- even though it was created years after the defendant's trial -- and committed a breach of that duty.  She rejected the Commonwealth's argument that the 1990 Bass affidavit lacked credibility simply because Bass himself had been found not credible in connection with Funderberg's 1992 motion for a new trial.  Instead, the motion judge found the affidavit "facially credible," reasoning that it was signed under oath, was detailed, and lacked any apparent ulterior motive.  The motion judge further reasoned that the existence of pending charges against Bass at the time of the defendant's trial -- a fact that was not presented for consideration by the judge who denied Funderberg's motion for a new trial -- bolstered the credibility of the 1990 Bass affidavit, given that these charges could have served as incentive for Bass to testify against the defendant.  The motion judge then found that the Commonwealth's failure to disclose the affidavit resulted in prejudice to the defendant, as "[a]ll the witnesses with information relevant to the recantation," including O'Malley, Delosh, and Bass, are now dead.
            Discussion.  Where, as here, "the defendant's motion for a new trial was allowed and the matter is before us on the Commonwealth's appeal, we do not apply the substantial likelihood of a miscarriage of justice standard provided in G. L. c. 278, § 33E."  Commonwealth v. Alvarez, 433 Mass. 93, 101 n.8 (2000).  Rather, we review the motion judge's ruling for abuse of discretion or other error of law.  See Commonwealth v. Moore, 489 Mass. 735, 749 (2022).  We determine a judge to have abused her discretion when the judge makes a "clear error of judgment in weighing the factors relevant to the decision . . . such that the decision falls outside the range of reasonable alternatives" (citation omitted).  Commonwealth v. Kolenovic, 471 Mass. 664, 672 (2015), S.C., 478 Mass. 189 (2017).  However, "[w]here the defendant's motion for a new trial raises an issue of constitutional dimension, . . . we are not bound by an abuse of discretion standard, but rather examine the issue independently" (citation and quotation omitted).  Commonwealth v. Drayton, 473 Mass. 23, 32 (2015), S.C., 479 Mass. 479 (2018).  Because the motion judge was not the trial judge, "we defer only to the judge's assessment of the credibility of witnesses at the evidentiary hearing on the new trial motion, but we consider ourselves in as good a position as the motion judge to assess the trial record."  Commonwealth v. Haley, 413 Mass. 770, 773 (1992).
            Here, we examine in turn each of the following three bases on which the motion judge relied in allowing the defendant's fourth motion for a new trial:  (1) newly discovered evidence in the form of eyewitness identification science; (2) the Commonwealth's failure to disclose Brady evidence; and (3) the Commonwealth's failure to disclose the 1990 Bass affidavit.  
            1.  Eyewitness identification science.  The defendant argues that the motion judge acted within her discretion in finding that eyewitness identification science constitutes newly discovered evidence that would have affected the jury's deliberations.  In opposition, the Commonwealth argues that any flaws in the identification process already were aired before the jury.
            This is not the first time we have considered whether new research qualifies as newly discovered evidence meriting a new trial.[14]  For instance, in Commonwealth v. Sullivan, 469 Mass. 340, 349, 351-352 (2014), this court determined that the results of a new, more sophisticated method of analyzing deoxyribonucleic acid (DNA) qualified as newly available evidence warranting a new trial.  We reasoned that the new DNA analysis was not cumulative of other physical evidence presented at trial, as the DNA samples at the scene of the crime constituted the "sole pieces of physical evidence indicating the defendant had been in the presence of the victim during the killing."  Id. at 352.  The "evidence presented against the defendant at trial was not otherwise so compelling as to render this new evidence unlikely to have been a real factor in the jury's deliberations."  Id.  Because the DNA evidence related to the "central issue" of the case, i.e., whether the defendant was even present at the scene of the killing, and because the evidence against the defendant was "not otherwise so compelling," we concluded that the results would "probably [have been] a real factor in the jury's deliberations" and warranted a new trial.  Id. at 351-353.  
            A year later, we again concluded that the results of a DNA analysis qualified as newly available evidence in Commonwealth v. Cowels, 470 Mass. 607, 618-619, 624 (2015).  We emphasized that the case against the defendants was "entirely circumstantial" -- there were no eyewitnesses to the crime, no murder weapon was recovered, and no forensic evidence tied the defendants to the crime.  Id. at 619.  Instead, the defendants' convictions "hinged, to a significant extent, on the testimony of [one witness]," who had "numerous and significant" credibility problems.  Id.  Because the "over-all strength or weakness of the evidence presented against a defendant" is an important consideration in determining "whether the newly discovered evidence would have been a real factor in the jury's deliberations," we determined in Cowels that the "paucity of physical evidence in the case, the vital importance of [one witness's] testimony, and the substantial challenges to [that witness's] credibility" necessitated a new trial.  Id. at 619, 623-624.  
            Beyond the context of DNA evidence, we have also concluded that new research on shaken baby syndrome constituted newly discovered evidence.  Epps, 474 Mass. at 767.  In Epps, defense counsel claimed that he could not find a believable, credentialed expert for trial to counter the prosecution's evidence on shaken baby syndrome.  Id. at 766.  On review, we concluded that because of "new research published after trial and the number of published court cases where [defense experts with solid credentials] ha[d] testified," the defendant could find an expert at the time of his appeal in 2016 that he might not have been able to find for his 2007 trial.  Id.  Therefore, the defendant was "deprived of a defense" at trial in part from "the evolving scientific research that demonstrates that a credible expert could offer important evidence in support of this defense."  Id. at 767-768.  
            Bearing this case law in mind, we examine whether the motion judge appropriately determined that the developments in eyewitness identification research constitute newly discovered evidence in this case and, if so, whether a new trial is warranted because of the prejudice the defendant suffered in its absence.
            a.  Newly discovered evidence.  Evidence qualifies as newly discovered where it was "unknown to the defendant or his counsel and not reasonably discoverable by them at the time of trial (or at the time of the presentation of an earlier motion for a new trial)."  Commonwealth v. Grace, 397 Mass. 303, 306 (1986).  
            We conclude that the motion judge did not err in determining that the developments in eyewitness research constitute newly discovered evidence.  As the motion judge noted, the field of eyewitness identification research did not even exist until years after the defendant's trial.  See Cowels, 470 Mass. at 616 ("we would find [argument that DNA evidence was not newly available] unpersuasive, given that this court did not determine the admissibility of DNA testing of the type performed here" until years after defendants' trial).  See, e.g., Gomes, 470 Mass. at 367 (acknowledging "near consensus" in scientific community about five principles regarding eyewitness identification as recently as 2015).  Both parties agree that eyewitness identification research was unavailable to the defendant at the time of trial.  There is therefore ample support for the conclusion that the new research on eyewitness identification presented by the defendant qualifies as newly discovered evidence in this case.  See Cowels, supra at 616-617 (whether DNA evidence was newly discovered was supported by fact that DNA science developed after defendants' trial).  The motion judge did not abuse her discretion in reaching the same determination.  
            b.  Prejudice.  In order for a motion for a new trial predicated on newly discovered evidence to succeed, a defendant must establish prejudice or materiality.  See Commonwealth v. Scott, 467 Mass. 336, 360 (2014).  A defendant establishes prejudice by establishing that the evidence "would probably have been a real factor in the jury's deliberations," such that its absence "casts real doubt on the justice of the conviction."  Epps, 474 Mass. at 763-764, quoting Cowels, 470 Mass. at 616, 617. 
            The motion judge did not abuse her discretion in concluding that new eyewitness identification research likely would have been a "real factor in the jury's deliberations," such that a new trial is warranted.  See Cowels, 470 Mass. at 624.  Perhaps most glaringly, the defendant's expert warned that a witness receiving information, such as suggestive statements, from a third party can lead to false memories and erroneous identifications.  Sulfaro testified that he received a telephone call from a Detective Murphy on the same day as his second photographic identification letting him know that he had selected the wrong photographs during the first identification procedure.  A Boston police officer then claimed at trial that no such "Murphy" worked at the Boston police department.  While the Commonwealth asks us to discount this testimony, Sulfaro's recollection of this telephone call is supported by the Murphy note, which the motion judge found "establishes that there was an officer involved in the investigation named Murphy."
            Further, Sulfaro selected the defendant's photograph only during the second round of photographic identifications, after having selected the photographs of two different men during the first round.[15]  This second identification process occurred two months after Sulfaro saw the suspects during a highly stressful situation -- his father's murder.  As the motion judge found, an "eyewitness expert [today] could have explained to the jury how and why the February 1975 identification was flawed."  
            Where no physical evidence tied the defendant to the crime scene, and other circumstantial evidence placing the defendant at or near the scene -- such as Bass's testimony, discussed below -- had weaknesses, the flaws identified by the expert could have prompted the jury to question seriously the reliability of Sulfaro as the sole eyewitness.  Compare Cowels, 470 Mass. at 623-624 (substantial risk that newly available DNA testing would have altered outcome in light of over-all weakness of evidence against defendant, including scant physical evidence and testimony of witness with significant credibility issues), with Commonwealth v. Kirkland, 491 Mass. 339, 354 (2023) (absence of eyewitness identification expert for potentially suggestive photographic array not prejudicial given witness's "identification of the defendant based on his facial features and familiarity from the neighborhood, as well as the physical evidence against the defendant"), and Commonwealth v. Franklin, 465 Mass. 895, 913-914 (2013) (absence of eyewitness identification jury instruction not prejudicial where identification was challenged on cross-examination with evidence that witness was alcoholic, under influence at time, and had at least ten prior criminal convictions).
            In analyzing the prejudice to the defendant, "[w]e need not determine . . . whether the defendant would be found not guilty were [expert evidence] presented."  Epps, 474 Mass. at 770.  See Commonwealth v. Ellis, 475 Mass. 459, 476-477 (2016), quoting Cowels, 470 Mass. at 616 ("[t]he motion judge decides not whether the verdict would have been different, but rather whether the new evidence would probably have been a real factor in the jury's deliberations").  Indeed, we recognize that in his third motion for a new trial, the defendant inculpated himself in an effort to reduce his sentence.  However, because the new eyewitness identification research that has emerged since trial "demonstrate[s] the [necessary] materiality, weight, and significance," Grace, 397 Mass. at 305-306, and because of the myriad errors in the identification process, see Commonwealth v. Marini, 375 Mass. 510, 519-521 (1978) (where case against defendant was "substantial" but not overwhelming, "there remains some probability" identification was "inaccurate," such that improper in-court voice identification procedure was not "without effect on the jury" and resulted in error), we conclude that the motion judge did not abuse her discretion in finding that this newly discovered evidence would probably have been a real factor in the jury's deliberations.  After all, "[t]he fundamental principle established by Mass. R. Crim. P. 30 (b)[, as appearing in 435 Mass. 1501 (2001),] is that, if it appears that justice may not have been done, the valuable finality of judicial proceedings must yield to our system's reluctance to countenance significant individual injustices."  Commonwealth v. Brescia, 471 Mass. 381, 388 (2015).  See generally Commonwealth v. Johnson, 420 Mass. 458, 465 (1995) ("There is no question that the danger of mistaken [eyewitness] identification by a victim or a witness poses a real threat to the truth-finding process of criminal trials").  
            2.  The arrest of David Bass and other alleged Brady material.  The defendant argues that the Commonwealth violated its Brady obligations by failing to disclose the 1976 arrest of David Bass, the Murphy note, and the injury note.  The Commonwealth argues that none of these pieces of evidence is exculpatory.  The Commonwealth further argues that, even if any of these pieces of evidence were exculpatory, the failure to disclose them did not result in prejudice to the defendant due to other evidence of his guilt in the record.  
            "To obtain a new trial on the basis of nondisclosed exculpatory evidence," a defendant must show that (1) the evidence was in the possession, custody, or control of the prosecution team; (2) the evidence tends to exculpate the defendant; and (3) the nondisclosure prejudiced the defendant.  Commonwealth v. Sullivan, 478 Mass. 369, 380 (2017).  See Graham v. District Attorney for the Hampden Dist., 493 Mass. 348, 361-363 (2024) ("To be considered exculpatory, and therefore subject to automatic disclosure, evidence need only 'tend to diminish [a defendant's] culpability'" [citation omitted]).  See also Commonwealth v. Tucceri, 412 Mass. 401, 413 (1992) (prejudice if "there is a substantial risk that the jury would have reached a different conclusion if the evidence had been admitted at trial").  
            The Commonwealth does not contest that it was in possession of any of the evidence at issue at the time of trial.  We agree with the defendant that the Murphy note, as well as the arrest of David Bass by O'Malley two months before the defendant's trial, both qualify as exculpatory evidence and that the defendant was prejudiced by nondisclosure of this evidence.  However, we disagree that the defendant was prejudiced by nondisclosure of the injury note.  
            a.  Bass arrest.  The arrest of David Bass two months before the defendant's trial constitutes undisclosed exculpatory evidence.  The Commonwealth's Brady obligation includes the disclosure of evidence that "challenges the credibility of a key prosecution witness."  Matter of a Grand Jury Investigation, 485 Mass. 641, 647-649 (2020), quoting Commonwealth v. Ellison, 376 Mass. 1, 22 (1978).  Bass was a key witness who testified against the defendant when, unknown to the defendant, Bass faced criminal charges.  His pretrial arrest and pending criminal charges provided Bass with a motive to curry favor with the government and "tend[ed] to exculpate the defendant."  Matter of a Grand Jury Investigation, supra at 649.  The defendant's inability to challenge the credibility of a key witness who placed the defendant near the scene of the crimes on the day of the shooting raised a "substantial risk that the jury would have reached a different conclusion if the evidence had been admitted at trial."  Tucceri, 412 Mass. at 413.  Therefore, the motion judge properly granted a new trial based on the nondisclosure of the Bass arrest.
            The Commonwealth argues that even if the Bass arrest had been disclosed, it would not have been admissible under Commonwealth v. McGhee, 472 Mass. 405, 425 (2015), as the arrest did not necessarily indicate any bias coloring Bass's testimony.  We are not convinced.  In McGhee, we concluded that the trial judge did not abuse her discretion in precluding the impeachment of a witness based on the witness's pretrial arrest because the charges were entirely unrelated to the underlying facts at trial and there was "no evidence to suggest" that the witness "changed her version of events" following her arrest.  Id. at 424-425.  
            In contrast, Bass's arrest was related directly to the underlying facts of the defendant's trial.  Bass was arrested by O'Malley, a homicide detective, for the operation of the very shooting gallery where Bass, in his testimony, placed the defendant on the day of the murder.  Further, Sulfaro initially identified Hamilton and Daniels -- Bass's brother-in-law at the time of trial and Bass's stepson, respectively -- during the first identification procedure, providing Bass with another motive to curry favor with the government by testifying against the defendant.  Although Bass's testimony against the defendant was echoed by that of his wife and Hamilton at trial, both of those witnesses would logically share the same motive as Bass, given that Sulfaro's first identification implicated both Lorene Bass's son and Hamilton himself.  Then, after Bass testified, the charges against him were resolved.  While "there typically must be a 'material' change of the witness's testimony postdating the charge to render [the fact of a witness's arrest] subject to impeachment," Commonwealth v. Roby, 462 Mass. 398, 412 (2012), Bass's arrest was so inextricably tied to the underlying facts of the defendant's trial as to render it an exception to this rule.  In short, Bass's arrest was indicative of possible bias and likely admissible under McGhee, 472 Mass. at 425.  
            b.  The notes.  We begin with the injury note.  The injury note tended to exculpate the defendant, as it supported his mistaken identity defense:  where the assailants were seen running away from the scene of the crimes, the defendant claims he could not have been among them because of his leg injury.  See Matter of a Grand Jury Investigation, 485 Mass. at 649.  However, the nondisclosure of the injury note did not result in prejudice to the defendant because "it would not have made a difference in the jury's thinking or verdicts."  Sullivan, 478 Mass. at 382-383.  Defense counsel conceded that his investigator had obtained copies of the defendant's medical records prior to trial, such that the defendant was equipped to raise this point without the use of the injury note.  See id. at 383 (agreeing with motion judge that defendant was able to make general point to jury without undisclosed Brady evidence).  See also Commonwealth v. Barry, 481 Mass. 388, 400-401, cert. denied, 140 S. Ct. 51 (2019) (no prejudice where evidence was cumulative).  Therefore, while the motion judge was correct that the injury note tended to exculpate the defendant, see Matter of a Grand Jury Investigation, supra, she erred in finding that the defendant was prejudiced by its nondisclosure.
            In contrast, the Murphy note resulted in prejudice to the defendant.  It constituted exculpatory evidence, as the note supported that the second identification procedure was marred by a suggestive call from Murphy.  See Matter of a Grand Jury Investigation, 485 Mass. at 649.  At trial, Sulfaro said that "Detective Murphy" called him on the morning of his second identification procedure to tell him that he had "identified the wrong persons . . . the first time."  In response, the prosecutor said he had "no knowledge of any Detective Murphy connected with this case," and a police officer testified that "[w]e have no such Officer Murphy."  The Murphy note would have weakened substantially the Commonwealth's argument that, because there was no person named Murphy involved in the case, Sulfaro was mistaken about receiving a call from Murphy, such that it was not merely duplicative of Sulfaro's testimony.  Rather, the Murphy note would have "substantially aided" the defendant "in seeking to create a reasonable doubt" about the integrity of Sulfaro's identification.  Commonwealth v. Martin, 427 Mass. 816, 823 (1998).  Because the note would have probably been a "real factor in the jury's deliberations," see Sullivan, 469 Mass. at 353, we agree with the motion judge that nondisclosure of the Murphy note resulted in prejudice to the defendant.[16] 
            3.  1990 Bass affidavit.  "Upon a motion for a new trial based on recantation by a material witness, the duty of the [motion judge] is to give grave consideration to the credibility of the witness's new testimony."  Commonwealth v. Robertson, 357 Mass. 559, 562 (1970).  The decision is left to the motion judge's discretion.  See id.  "The abuse of discretion standard is not altered when the newly discovered evidence is an alleged recantation by a material witness."  Commonwealth v. Santiago, 458 Mass. 405, 414 (2010).  Rather, "[a]t all times, the underlying principles governing a motion for a new trial predicated on newly discovered evidence remain in force."  Id. at 415.
            The motion judge found that the 1990 Bass affidavit was "facially credible" because it was "detailed and understandable" and "signed under oath."  The motion judge then found that its nondisclosure -- when coupled with the Bass arrest, new eyewitness identification science, and the fact that David, Lorene, and O'Malley have since died -- resulted in prejudice to the defendant.  On review, we conclude that the motion judge did not evaluate all available evidence when considering "the credibility of [Bass's] new testimony."  Santiago, 458 Mass. at 415.  Therefore, the 1990 Bass affidavit likely would not have been "a real factor in the jury's deliberations" and did not result in prejudice to the defendant (citation omitted).  Commonwealth v. Cameron, 473 Mass. 100, 104-105 (2015).  
            The 1990 Bass affidavit -- which states that Anderson, Funderberg, and the defendant never went to the Basses' apartment -- is severely undercut by the existence of the 1991 Bass affidavit, in which Bass averred that the defendant, Anderson, and three other men had entered his apartment on the day of the shooting, but not Funderberg.  Bass was then found "not credible" during a 1992 hearing on Funderberg's motion for a new trial, where Bass testified that the defendant had been armed and accompanied by Anderson and two other men, but not Funderberg, on the day of the shooting.  This testimony again undercuts the significance of the 1990 Bass affidavit.  Although the motion judge considered the 1992 credibility determination in her evaluation of the 1990 Bass affidavit, she erred in failing to consider the effect of Bass's other inconsistent statements on the 1990 Bass affidavit's credibility.  More broadly, all the foregoing inconsistencies call into question Bass's credibility as a witness.  Therefore, although it was written after trial and therefore constitutes newly discovered evidence under Grace, 397 Mass. at 306, the 1990 Bass affidavit "would probably [not] have been a real factor in the jury's deliberations."  Epps, 474 Mass. at 763-764, quoting Cowels, 470 Mass. at 616.  See generally Commonwealth v. Rosario, 477 Mass. 69, 78-79 (2017) (motion judge must consider "unique confluence of events in light of the totality of the circumstances").  
            Notwithstanding the lack of prejudice, we next consider whether the government had a duty to disclose the 1990 Bass affidavit under both art. 12 of the Massachusetts Declaration of Rights and rule 3.8.  The Commonwealth argues that Brady obligations only extend through trial, such that they had no art. 12 duty to disclose the 1990 Bass affidavit, created posttrial.  As to rule 3.8, the Commonwealth contends that they had no duty to disclose because the 1990 Bass affidavit is not credible.  We agree with the Commonwealth on both counts.  
            We begin with Brady.  The government's duty to disclose material exculpatory evidence to defendants under Brady has not been extended to evidence that comes into the government's possession, custody, or control after the conclusion of trial.  See District Attorney's Office for the Third Judicial Dist. v. Osborne, 557 U.S. 52, 68-70 (2009) (error to extend Brady right of pretrial disclosure postconviction); Matter of a Grand Jury Investigation, 485 Mass. at 646-650.  The defendant was convicted in 1976, and the Bass affidavit was signed in 1990.  Therefore, the Commonwealth was not obligated to disclose the 1990 Bass affidavit under either Brady or art. 12.
            As to the Commonwealth's duty of disclosure under our ethical rules, rule 3.8 (i) requires that "[w]hen, because of new, credible, and material evidence, a prosecutor knows that there is a reasonable likelihood that a convicted defendant did not commit an offense of which the defendant was convicted," the prosecutor shall disclose that evidence (emphasis added).  Because the 1990 Bass affidavit was not credible, as discussed above, it did not require disclosure under rule 3.8 (i). 
            However, rule 3.8 (d) requires that the prosecution "make timely disclosure to the defense of all evidence or information known to the prosecutor that tends to negate the guilt of the accused or mitigates the offense."  See Commonwealth v. Caldwell, 487 Mass. 370, 374-375 (2021).  Rule 3.8 (d) "derives from the core responsibility of a prosecutor 'to administer justice fairly.'"  Graham, 493 Mass. at 361, quoting Committee for Pub. Counsel Servs. v. Attorney Gen., 480 Mass. 700, 730 (2018).  Disclosure under rule 3.8 (d) is neither time limited, nor is it predicated on a request by a defendant for exculpatory information.  See Mass. R. Prof. C. 3.8 (d).  Rather, the overarching purpose of rule 3.8 (d) is to ensure that "the defendant is accorded procedural justice, that guilt is decided upon the basis of sufficient evidence, and that special precautions are taken to prevent and to rectify the conviction of innocent persons."  Id. at comment 1.    
            Because "[t]he obligations imposed on a prosecutor by the rules of professional conduct are not coextensive with the obligations imposed by substantive law," our rules of professional conduct can, and do, go beyond the obligations under Brady.  Mass. R. Prof. C. 3.8 comment 3A.  See American Bar Association Standing Committee on Ethics and Professional Responsibility, Formal Op. 09-454, at 3 (July 8, 2009) (rule 3.8 of Model Rules of Professional Conduct understood to "not simply codify existing constitutional law but impose[] a more demanding disclosure obligation").  Consistent with prosecutors' broader disclosure obligations, see, e.g., Graham, 493 Mass. at 364 ("prosecutors cannot, consistent with their obligation to disclose exculpatory information, withhold at their discretion" exculpatory information), we interpret rule 3.8 (d) to require the disclosure of any witness recantation known to the Commonwealth to defendants and, where applicable, their counsel and any codefendants.  See, e.g., Matter of Larsen, 2016 UT 26, ¶ 41 (Brady standard and prosecutor's ethical duty under Utah's rule 3.8 [d] "are distinct" because rule 3.8 "aimed not only at assuring a fair trial . . . but also at establishing an ethical duty that will avoid the problem in the first place").  Going forward, we read rule 3.8 (d) to require the disclosure of any witness recantation known to the Commonwealth -- regardless of its credibility or timeliness -- to all defendants and, where applicable, their codefendants.  See Mass. R. Crim. P. 32 (a), as amended, 476 Mass. 1501 (2017).
            Conclusion.  Given the newly discovered research findings that shed light on the flaws in the eyewitness identification procedure, as well as the Commonwealth's failure to provide exculpatory evidence, we agree with the motion judge that "justice may not have been done" in this case.  Mass. R. Crim. P. 30 (b).  Accordingly, we affirm the motion judge's grant of the defendant's motion for a new trial. 
So ordered.
 
footnotes

 
            [1] We acknowledge the amicus briefs in support of the defendant submitted by the Massachusetts Association of Criminal Defense Lawyers; the Innocence Project, Inc., the New England Innocence Project, and the Boston College Innocence Program; and the Criminal Justice Institute at Harvard Law School and Families for Justice as Healing.  We also acknowledge the amicus letter submitted by the American Civil Liberties Union of Massachusetts, Inc.
            [2] For ease of reference, when mentioned together, we refer to David Bass and Lorene Bass individually by their first names.  Otherwise, "Bass" refers to David Bass.
            [3] By the time of trial, Hamilton was a brother-in-law to the Basses.
            [4] Daniels died before the defendant's trial.
            [5] On the plane, Delosh was seated just across the aisle from O'Malley and the defendant; O'Malley occupied the window seat while the defendant occupied the aisle seat.  
            [6] Anderson was tried separately in December 1975 and was convicted of murder in the first degree, armed robbery, and unlawfully carrying a firearm.  See Commonwealth v. Anderson, 425 Mass. 685, 686 (1997).  
            [7] Funderberg was found guilty of the same charges, along with the charge of unlawfully possessing a firearm.  He since has passed away.
            [8] For purposes of the present appeal, the arguments asserted by the defendant in these further efforts are immaterial.
            [9] Hamilton and Daniels were arrested shortly after they were identified by Sulfaro.
            [10] The defendant also received an affidavit signed by Anderson in 2020, in which Anderson recanted his March 1975 confession that implicated both Funderberg and the defendant in the crimes.
            [11] Another factor considered by the motion judge, which we need not reach, is evidence that O'Malley committed misconduct "both prior to and years after" the defendant's trial.  Specifically, about two years before the defendant's trial, O'Malley was disciplined after he "fail[ed] to file a report" in an alleged cover-up of a patrolman striking O'Malley's partner.  Then, in connection with a murder investigation years after the defendant's trial, O'Malley, among others, was found to have "engaged in coercive, threatening conduct directed at several civilian witnesses" to elicit false incriminating statements.  See O'Malley vs. Martin, U.S. Dist. Ct., No. 94-11392-WGY (D. Mass. Feb. 29, 1996).  
            Under a confluence of factors analysis, the motion judge reasoned that O'Malley's misconduct "cast[] doubt on [the defendant's] alleged confession" and "was important to establish [Sulfaro's] identification of [the defendant]," such that his misconduct weighed in favor of granting the defendant's motion for a new trial.  In reaching this conclusion, she relied on Matter of a Grand Jury Investigation, 485 Mass. 641, 652 (2020), where we decided that prior misconduct can be admitted to impeach an officer if it is "probative of how the officer conducts police investigations" and, further, that "a judge may consider whether the misconduct reflects a willingness to lie to win a conviction."  
            Because Matter of a Grand Jury Investigation, 485 Mass. at 645, 652, discusses instances of filing "false police reports" and prior misconduct, we leave for another day whether the reasoning in this case is applicable.  Further, we note that O'Malley's claim that the defendant confessed to him on the plane ride home was corroborated by the testimony of Delosh.  See Commonwealth v. Brescia, 471 Mass. 381, 391 (2015) (confluence of factors analysis requires holistic assessment of evidence to determine whether justice done).
            [12] Specifically, although portions of the Murphy note are difficult to read, the note appears to state:  "District 2 called and stated that they have under arrest [illegible] warrant and will be in Rox[bury] Court this A.M. one Jerry Funderberg who is supposed to be wanted by Homicide for the . . . shooting [at the market where the victim's shoe repair store was located]."  
            [13] The motion judge credited trial counsel's testimony that he did not receive the injury note, the Murphy note, or evidence of the Bass arrest before or during trial.
            [14] Newly discovered evidence is evidence that is "unknown to the defendant or counsel and not reasonably discoverable by them at the time of trial."  Commonwealth v. Sullivan, 469 Mass. 340, 350 n.6 (2014).  Newly available evidence, on the other hand, is "evidence that was unavailable at the time of trial for a reason such as a witness's assertion of a privilege against testifying or, as [in the case of DNA evidence], because a particular forensic testing methodology had not yet been developed or gained acceptance by the courts."  Id.  Both utilize the same standard of review for purposes of a motion for a new trial.  See id.  In discussing new scientific research on shaken baby syndrome in Epps, 474 Mass. at 763-767, we focused on the question whether the research constituted newly discovered, rather than newly available, evidence.  Because the development of eyewitness identification research is similar to the evolution of shaken baby syndrome research in Epps, as opposed to a "particular forensic testing methodology," Sullivan, supra, we refer to the expert evidence here as newly discovered evidence.
            [15] Sulfaro's prior faulty identification was aired before the jury.
            [16] In concluding that Sulfaro's identification of the defendant was not unduly suggestive on direct appeal, this court highlighted that there had been "no intervening communication between the identifying witness and the police," underscoring the significance of the Murphy note.  Funderberg, 374 Mass. at 582.